**United States District Court**
For the Northern District of California

1

2

3

4

5                    UNITED STATES DISTRICT COURT

6                  NORTHERN DISTRICT OF CALIFORNIA

7

8    NATHAN BURGOON, *et al.*,                    No. C-15-1381 EMC

9             Plaintiffs,

10       v.                                        **ORDER DEFERRING RULING ON**
                                                   **DEFENDANTS' MOTIONS TO**
11   NARCONON OF NORTHERN                          **COMPEL ARBITRATION AND**
     CALIFORNIA, *et al.*,                         **DISMISS; AND GRANTING**
12                                                 **PLAINTIFFS' MOTION FOR LEAVE**
             Defendants.                           **TO AMEND**
13   _____/
                                                   **(Docket Nos. 25, 27, 49)**
14

15

16       Plaintiffs Nathan Burgoon and Caleb Landers are individuals who signed up for drug

17  treatment programs at facilities known as "Narconon Centers."  Defendants are either Narconon

18  Centers or affiliated in some fashion with such facilities.  Plaintiffs have filed a class action against

19  Defendants, asserting in essence that Defendants are not truly offering a drug treatment program but

20  rather recruiting and indoctrinating vulnerable persons (because they have addictions) into

21  Scientology.  According to Plaintiffs, Defendants have engaged in fraud by (1) professing to offer a

22  secular program not affiliated with any religion when in fact that was not the case and (2) claiming

23  the program had a high success rate when in fact that was not the case.  Plaintiffs also maintain that

24  Defendants breached their contracts by failing to offer a secular program by not having a high

25  success rate.

26       Currently pending before the Court are two motions to compel arbitration or, in the

27  alternative, to dismiss.  The first motion has been brought by the following Defendants: Narconon

28  Fresh Start ("NFS"); Narconon Western United States ("Western"); Narconon International

**United States District Court**
For the Northern District of California

("International"); and Association for Better Living and Education International ("ABLE"). The second motion has been brought by the remaining Defendant: Narconon of Northern California ("NNC"). Also pending before the Court is Plaintiffs' motion for leave to amend, in which Plaintiffs seek to drop their claim for breach of contract.

Having considered the parties' briefs and accompanying submissions, including the supplemental briefing ordered by the Court, the Court hereby **DEFERS** ruling on both the motions to compel arbitration and the alternative motions to dismiss. As discussed below, the Court defers ruling on the motions to dismiss in order to resolve the motions to compel first. As for the motions to compel, the Court defers ruling in order to hold a trial on the issues of Plaintiffs' alleged mental incapacity and alleged undue influence by Defendants. Finally, the Court **GRANTS** Plaintiffs' motion for leave to amend.

## I.   FACTUAL & PROCEDURAL BACKGROUND

A.   Allegations in Complaint

In their complaint, Plaintiffs allege as follows:

Narconon Centers are facilities that purport to be drug rehabilitation centers. Each Narconon Center offers a standardized program. *See* Compl. ¶ 21. The Narconon program "consists of eight courses founded upon the works of L. Ron Hubbard" and is "substantially identical to the religious practices, doctrines, and rituals of the Church of Scientology." Compl. ¶ 27. According to Plaintiffs, the Narconon program is designed to "recruit people into the Church of Scientology and Patients who complete the Narconon Program are to be 'route[d] to the nearest Org for further services if the individual so desires." Compl. ¶ 41. Two of the defendants in this case are, in essence, Narconon Centers: NFS and NNC. Mr. Landers sought treatment from NFS (the Warner Springs facility) and Mr. Burgoon sought treatment from NNC. *See* Compl. ¶¶ 55, 64.

The Narconon program itself appears to be owned by International. Each Narconon Center gets a license for the program from International. *See* Compl. ¶ 23. Each Narconon Center also gets a license to use the Narconon trademark from International. *See* Compl. ¶¶ 21-23. International, in turn, is licensed by ABLE to use the Narconon trademark. ABLE licenses the Narconon trademark on the behalf of the Church of Scientology. *See* Compl. ¶ 25.

**United States District Court**
For the Northern District of California

According to Plaintiffs, Narconon Centers such as NFS and NNC are completely controlled by ABLE, International, and (at least for some centers) Western.  For example:

- International provides training manuals to each Narconon Center which addresses implementation and administration of the program.  *See* Compl. ¶ 29.

- International publishes operations manuals for the Narconon program and requires that Narconon Centers follow the manuals.  *See* Compl. ¶ 77.

- ABLE, International, and, for some centers, Western conduct "tech inspections" of Narconon Centers which involve monitoring the manner in which the program is being delivered and making corrections.  *See* Compl. ¶ 94.

- International's approval is needed before a Narconon Center can demote, transfer, or dismiss a permanent staff member.  *See* Compl. ¶ 80.

- International and, for some centers, Western investigate misconduct of center employees and take disciplinary action.  *See* Compl. ¶ 84.

- Narconon Centers are required to send detailed weekly reports containing statistics of more than forty different metrics to International.  International and, for some centers, Western review the weekly reports and order changes base on increases or decreases in the statistics. *See* Compl. ¶ 87.

- The approval of ABLE, International, and, for some centers, Western is required for the Narconon Centers' promotional materials.  *See* Compl. ¶ 88.

- ABLE, International, and, for some centers, Western, participate in creating advertising materials for Narconon Centers.  *See* Compl. ¶ 89.

- International requires each Narconon Center to maintain a "building account fund," with the money being used to purchase premises for new Narconon Centers or "to protect the organization in times of financial hardship."  Compl. ¶ 91.

1.   Mr. Landers/NFS

As noted above, Mr. Landers sought treatment from the Narconon Center known as NFS.  In deciding to enroll, Mr. Landers relied on statements made by Dan Carmichael, "a representative of Defendants."  Compl. ¶ 64.  (Which specific Defendant actually employs Mr. Carmichael is not

United States District Court

For the Northern District of California

identified.)  One of those representations was that NFS had a success rate of 76 percent.  See Compl. ¶ 65.  Another representation was that the Narconon program is a secular one.  See Compl. ¶ 68.  A different representative of NFS also told Mr. Landers that "NFS was a secular drug rehabilitation facility."  Compl. ¶ 69.

In addition to the above, the NFS contract on its face provided that the "'rehabilitation program has an excellent success rate for students who actively and honestly participate in it and complete the entire program.'"  Compl. ¶ 47.

On or about October 2, 2014, Mr. Landers arrived at the NFS facility.  He paid initially $10,000.  See Compl. ¶¶ 71-72.  "Shortly thereafter, it became apparent to Mr. Landers that NFS had strong ties to Scientology and the Narconon Program was a tool to promote its teachings."  Compl. ¶ 72.  Mr. Landers thus decided to leave.  See Compl. ¶ 72.

2.    Mr. Burgoon/NNC

As noted above, Mr. Burgoon sought treatment from the Narconon Center known as NNC.  In deciding to enroll, Mr. Burgoon relied on representations that "the Narconon Program provided secular drug rehabilitation with a high success rate."  Compl. ¶ 59.  It appears that the NNC contract on its face also states that the Narconon program is secular in nature, stating:

> "The program was developed by William Benitez in 1996, while an inmate at an Arizona state penitentiary.  The techniques used in the program are based on specific discoveries involving problems of substance abuse and rehabilitation of L. Ron Hubbard, the founder of Scientology.  This program is secular and not associated with any religion."

Compl. ¶ 46.  As for the success rate, Mr. Burgoon saw on NNC's website that there was a success rate of over 70 percent.  See Compl. ¶ 58.

On or about November 18, 2014, Mr. Burgoon paid $37,500 to receive treatment at NNC.  *See* Compl. ¶ 55.  Ultimately, he decided to terminate his treatment "after complying with NNC's direction that he spend six to eight hours a day for twenty straight days in a hot sauna, in accordance with the Narconon Program."  Compl. ¶ 60 (emphasis omitted).  Mr. Burgoon was not given a refund of any amount.  *See* Compl. ¶ 60.

United States District Court
For the Northern District of California

3.     Claims

Based on, *inter alia*, the above allegations, Plaintiffs assert the following state law claims against Defendants:

(1)     Violation of the Consumers Legal Remedies Act ("CLRA"), see Cal. Civ. Code § 1780;

(2)     Violation of the Unfair Competition Law, see Cal. Bus. & Prof. Code § 17200;

(3)     Violation of the False Advertising Law, see Cal. Bus. & Prof. Code § 17500;

(4)     Negligent misrepresentation; and

(5)     Breach of contract.

As discussed below, Plaintiffs have filed a motion for leave to amend in which they seek to drop the claim for breach of contract.

B.     Arbitration Agreements

Based on the parties' submissions, the following facts are essentially undisputed.

1.     Mr. Landers/NFS

Mr. Landers signed a contract with NFS titled "Admission Agreement."[1]  The contract is a fourteen-page document.  Page 13 of the contract includes a provision on arbitration.  The arbitration provision states as follows:

**DISPUTE RESOLUTION**
**ARBITRATION**

The parties agree that any controversy, dispute or claim arising out of or relating to or involving this Admission Agreement shall be resolved by binding arbitration.  These claims subject to arbitration include but are not limited to any and all disputes or controversy regarding services provided, conditions at the [NFS] facility, the staff, the results of the program, other student's actions, claims of discrimination, consumer complaints or any other cause of action.

This provision applies to disputes, controversies or claims involving not only [NFS] but any related entities, licensors, the members of the Board of Directors, the officers and the staff.  The arbitrator shall be agreed upon by the parties.  (In the event the parties cannot agree upon an arbitrator, the American Arbitration Association shall, upon proper

---

[1] Mr. Landers's father also appears to have signed the agreement.  However, there does not appear to be any evidence that Mr. Landers's father had the ability to act on Mr. Landers's behalf. *See, e.g.*, Eric Landers Decl. ¶¶ 4, 6-7 (testifying that he went to the facility with Mr. Landers and that, "[w]hen we arrived at the facility I was separated from Caleb and asked to sign the admissions agreement, which I did"; adding, however, that he did not have authority to sign on Mr. Landers's behalf).

5

**United States District Court**
For the Northern District of California

application by the parties, appoint an arbitrator.)  The parties shall each pay and be responsible for half the fees and costs of the arbitration.  The arbitration shall take place in Los Angeles County, California unless the parties otherwise agree.  The parties understand and agree that in the event of arbitration, the decision of the arbitrator shall be binding and conclusive on the parties.  The arbitration proceedings and the decision at the arbitration shall be private and confidential.

INITIALS ____

Prior to arbitration, the parties may, but are not required to, seek to resolve the matter through a qualified mediator approved by a California court.  The parties shall each pay half the costs of such mediation.  The mediation shall be non-binding.

Farnsworth Decl., Ex. 1 (Agreement at 12).  As indicated by the above, embedded in this provision is a space for the admitee to provide his/her initials.  Mr. Landers's father, but not Mr. Landers himself, initialed the provision.

2.    <u>Mr. Burgoon/NNC</u>

Mr. Burgoon signed two contracts with NNC (both substantively the same) titled "Agreement for Drug and Alcohol Rehabilitation Services."[2]  Each contract is a ten-page document.  Pages 8 and 9 of the contract include a provision on arbitration.  The arbitration provision states as follows:

**<u>DISPUTE RESOLUTION THROUGH</u>**
**<u>MEDIATION FOLLOWED BY BINDING</u>**
**<u>NON-APPEALABLE ARBITRATION</u>**

The Parties agree that any controversy, dispute or claim arising out of, relating to or involving this Agreement; or any breach, termination, interpretation or disagreement concerning the validity of the Agreement; or the enrollment or participation of the Student in the [NNC] Program, including any claim for personal injuries or wrongful death, and any claim for refund that cannot be promptly settled by direct communication shall first be submitted for resolution by mediation through a mediator to be agreed upon by the Parties.  If the Parties cannot agree on a mediator, either party may petition the appropriate court for selection of a mediator pursuant to California Code of Civil Procedure ("CCP") Section 1775.6.  Each Party shall share equally in the costs of the mediator.  A Party's request or petition for mediation must be in writing and must be submitted to the other Party within one hundred eight (180) days following the event giving rise to the dispute.  The mediation shall take place in Santa Cruz County, California, before a single mediator, with the specific location agreed to be the Parties.

_____

[2] One contract was signed on July 27, 2014; the other on August 3, 2014.

> If the best efforts of the Parties to mediate a resolution do not result in a settlement of their differences, then any remaining claim, dispute, or controversy shall be determined by binding, non-appealable, arbitration pursuant to CCP Section 1280 et seq.  The arbitration shall take place in Santa Cruz County, California before a single arbitrator agreed upon by the Parties or, if no agreement, as selected by the court as provided in CCP Section 1281.6.  In the event of arbitration, the decision of the arbitrator shall be binding and conclusive on the Parties and each party WAIVES ITS RIGHT TO APPEAL except as allowed in CCP Section 1285 et seq.

> This Agreement is intended to bind and benefit the Student, the Guarantor and their heirs and successors.  Judgment on any award may be entered in any court having jurisdiction.  Any right to jury trial is intentionally waived.  The costs of arbitration shall be in accordance with CCP Section 1284.2.  Any demand for arbitration must be made within Ninety (90) days after a failed mediation.  If no arbitration is demanded within Ninety (90) days of a failed mediation, then all rights to sue, arbitrate, and recover damages which might otherwise below to the Student, the Guarantor and their heirs and successors shall be barred forever without regard to the theory of recovery.

Quaid Decl., Exs. A-B (Agreements at 8-9) (emphasis in original).  Immediately after this provision, there is a space for the Student to provide his/her initials as well as the date.  Mr. Burgoon initialed the provision, as well as provided the date.

C.    Contract Formation

Although the above facts regarding the arbitration agreements are, in essence, undisputed, the parties have a significant dispute regarding the formation of those agreements – including the larger contracts (*i.e.*, the admission agreements) of which the arbitration agreements are a part. Plaintiffs take the position that they lacked the mental capacity to contract and/or were unduly influenced to enter into the contracts, which included the arbitration agreements.  *See, e.g.*, Burgoon Decl. ¶¶ 3-4 (testifying that, when he was admitted to the facility on July 27, 2014, he was "under the influence of heroin" and "was higher than [he] had ever been before"); Burgoon Decl. ¶¶ 11-17 (testifying that he signed another admissions agreement on August 3, 2014, after being pressured); Landers Decl. ¶ 7 (testifying that, on the day of his admittance to the facility, he signed something but he did not know what he signed because he was experiencing withdrawal symptoms). Defendants argue to the contrary.  *See generally* Quaid Reply Decl.; Hardig Decl.; Ryan Decl.; Harris Decl.; Bogart Decl.; Chapurski Decl.; Walters Decl.

**United States District Court**
For the Northern District of California

1                                        **II.   DISCUSSION**

2 A.        Legal Standard

3          The parties agree that the Federal Arbitration Act ("FAA") governs the instant case.  The

4 FAA provides that

> [a] written provision in . . . a contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract or transaction, or the refusal to perform the whole or any part thereof, or an agreement in writing to submit to arbitration an existing controversy arising out of such a contract, transaction, or refusal, shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract.

9 U.S.C. § 2.

The FAA further provides that

> [a] party aggrieved by the alleged failure, neglect, or refusal of another to arbitrate under a written agreement for arbitration may petition any United States district court which, save for such agreement, would have jurisdiction under Title 28 [28 U.S.C. § 1 *et seq.*], in a civil action or in admiralty of the subject matter of a suit arising out of the controversy between the parties, for an order directing that such arbitration proceed in the manner provided for in such agreement. . . . The court shall hear the parties, and upon being satisfied that the making of the agreement for arbitration or the failure to comply therewith is not in issue, the court shall make an order directing the parties to proceed to arbitration in accordance with the terms of the agreement. . . . If the making of the arbitration agreement or the failure, neglect, or refusal to perform the same be in issue, the court shall proceed summarily to the trial thereof.  If no jury trial be demanded by the party alleged to be in default, or if the matter in dispute is within admiralty jurisdiction, the court shall hear and determine such issue.  Where such an issue is raised, the party alleged to be in default may, except in cases of admiralty, on or before the return day of the notice of application, demand a jury trial of such issue, and upon such demand the court shall make an order referring the issue or issues to a jury in the manner provided by the Federal Rules of Civil Procedure, or may specially call a jury for that purpose. If the jury find that no agreement in writing for arbitration was made or that there is no default in proceeding thereunder, the proceeding shall be dismissed.  If the jury find that an agreement for arbitration was made in writing and that there is a default in proceeding thereunder, the court shall make an order summarily directing the parties to proceed with the arbitration in accordance with the terms thereof.

*Id.* § 4.

**United States District Court**
For the Northern District of California

B.      Plaintiffs' Arguments Against Arbitration

Although their admission agreements contain arbitration provisions, Plaintiffs argue that they cannot be compelled to arbitrate because they lacked the mental capacity to contract and/or were unduly influenced to enter into the contracts.  They further argue that the arbitration agreements are unconscionable, which provides an independent ground to deny arbitration.  Finally, Plaintiffs argue that, at least as to Mr. Burgoon, the "higher-up" Narconon companies (*i.e.*, Western, International, and ABLE) are nonsignatories to the arbitration agreements and, therefore, cannot compel arbitration.

C.      Mental Incapacity and/or Undue Influence

As a preliminary matter, the parties disagree as to whether the Court or an arbitrator should decide the issues of mental incapacity and undue influence, as raised by Plaintiffs.  Defendants do not dispute that, "[g]enerally, in deciding whether to compel arbitration, a court must determine [the] 'gateway' issue[] [of] whether there is an agreement to arbitrate between the parties."  *Brennan v. Opus Bank*, No. 13-35580, 2015 U.S. App. LEXIS 14039, at *12 (9th Cir. Aug. 11, 2015).  But, Defendants point out, here, Plaintiffs are not just arguing mental incapacity and undue influence with respect to the agreements to arbitrate but rather mental incapacity and undue influence with respect to the larger contracts (*i.e.*, the admission agreements) of which the arbitration provisions are just a part.  According to Defendants, in such a circumstance, *i.e.*, where the contract as a whole is claimed invalid and not just the arbitration provision specifically, the arbitrator decides the issue and not the court.  *See Buckeye Check Cashing, Inc. v. Cardegna*, 546 U.S. 440, 445-46 (2006) (stating that, "unless the challenge is to the arbitration clause itself, the issue of the contract's validity [*e.g.*, fraudulent inducement] is considered by the arbitrator in the first instance").

The Court rejects Defendants' position.  First, Defendants ignore the fact that, in *Buckeye*, the Supreme Court specifically noted in its opinion that

> [t]he issue of the contract's validity is different from the issue *whether any agreement between the alleged obligor and obligee was ever concluded*.  Our opinion today addresses only the former, and does not speak to the issue decided in the cases cited by respondents (and by the Florida Supreme Court), which hold that it is for courts to decide whether the alleged obligor ever signed the contract, *Chastain v. Robinson-Humphrey Co.*, 957 F.2d 851 (11th Cir. 1992), whether the

1    signor lacked authority to commit the alleged principal, *Sandvik AB v.*
2    *Advent Int'l Corp.*, 220 F.3d 99 (3d Cir. 2000); *Sphere Drake Ins. Ltd.*
     *v. All American Ins. Co.*, 256 F.3d 587 (7th Cir. 2001), *and whether*
3    *the signor lacked the mental capacity to assent*, *Spahr v. Secco*, 330
     F.3d 1266 (10th Cir. 2003).

4    *Id.* at 444 (emphasis added).

5         Second, in *Granite Rock Co. v. International Brotherhood of Teamsters*, 130 S. Ct. 2847

6    (2010), the Supreme Court expressly stated that it is "well settled that where the dispute at issue

7    concerns *contract formation*, the dispute is generally for courts to decide." *Id.* at 2855-56 (emphasis

8    added). Contrary to what Defendants suggest, both mental incapacity and undue influence are issues

9    concerning contract formation. *See, e.g.*, *Lee v. Aurora Loan Servs.*, No. C 09-4482 JF (HRL), 2010

10   U.S. Dist. LEXIS 56094, at *18 (N.D. Cal. May 18, 2010) (stating that "[u]ndue influence is not an

11   independent claim, but rather a defense to the formation of a contract"). It is thus the Court's duty,

12   and not the arbitrator's, to assess Plaintiffs' assertions of mental incapacity and undue influence.

13        As to the merits of Plaintiffs' mental incapacity and undue influence arguments, the Court

14   finds that, based on the competing declarations submitted by the parties, there is a question of fact in

15   need of resolution. Accordingly, the Court shall schedule a trial for resolution of these issues. *See* 9

16   U.S.C. § 4 ("If the making of the arbitration agreement or the failure, neglect, or refusal to perform

17   the same be in issue, the court shall proceed summarily to the trial thereof."). **The parties are**

18   **ordered to meet and confer and to file a joint proposed trial plan within two weeks of the date**

19   **of this order.** The joint proposed trial plan shall address, *inter alia*, whether the trial shall be a jury

20   trial or a bench trial, how long the trial is expected to take, when the parties would prefer trial to be

21   scheduled, and what discovery is needed for trial.

22        1.    Ratification of Contract Through Judicial Admission

23        In making its ruling above, the Court acknowledges Defendants' contention that Plaintiffs

24   cannot assert mental incapacity and undue influence as defenses to contract formation because they

25   have asserted a claim for *breach of contract* and therefore implicitly ratified the contracts containing

26   the arbitration provisions. Defendants are correct that "a statement in a complaint may serve as a

27   judicial admission." *Sicor Ltd. v. Cetus Corp.*, 51 F.3d 848, 859 (9th Cir. 1995). That being said, a

28   party is not always conclusively bound to such an admission. The Ninth Circuit has stated that

"[f]actual assertions in pleadings and pretrial orders, *unless amended*, are considered judicial admissions conclusively binding on the party who made them." *Am. Title Ins. Co. v. Lacelaw Corp.*, 861 F.2d 224, 226 (9th Cir. 1988). The court has also noted: "Where . . . the party making an ostensible judicial admission explains the error in a subsequent pleading or by amendment, the trial court must accord the explanation due weight."[3] *Sicor*, 51 F.3d at 859-60.

In the case at bar, Plaintiffs are now asking to make an amendment as contemplated in *American Title* and *Sicor* – more specifically, to drop the breach-of-contract claim. Under Federal Rule of Civil Procedure 15, a court must "freely give leave [to amend] when justice so requires." Fed. R. Civ. P. 15(a)(2). "'[T]his policy is to be applied with extreme liberality.'" *Desertrain v. City of Los Angeles*, 754 F.3d 1147, 1154 (9th Cir. 2014). Factors for a court to consider in assessing a motion to amend are: "'bad faith, undue delay, prejudice to the opposing party, futility of amendment, and whether the plaintiff has previously amended the complaint.'"[4] *Id.*

Not surprisingly, Defendants have opposed the proposed amendment, arguing bad faith, prejudice, and even futility. The futility argument makes little sense. Defendants assert that "[t]he contracts exist, whether Plaintiffs plead them or not," Docket No. 57 (Opp'n at 8), but that argument misses the point. Plaintiffs are not disputing that there are signed contracts; with their amendment, they are simply making clear that they are not seeking any relief based on those contracts because it is their view that those contracts are not enforceable because of a contract formation problem. To the extent Defendants also argue futility because the proposed amendment renders Plaintiffs inadequate class representatives, *see* Docket No. 57 (Opp'n at 8), that argument also has little merit. At this point, the case is in its infancy and not even close to the class certification stage. Thus, the Court is evaluating the claims – at least at this point – on an individual basis only, and not a class basis.

---

[3] *Cf. Van Asdale v. Int'l Game Tech.*, 577 F.3d 989, 999 (9th Cir. 2009) (in discussing the sham affidavit rule applied in the summary judgment context, noting that "'the nonmoving party is not precluded from elaborating upon, explaining or clarifying prior testimony elicited by opposing counsel on deposition [and] minor inconsistencies that result from an honest discrepancy, a mistake, or newly discovered evidence afford no basis for excluding an opposition affidavit'").

[4] To the extent Defendants argue that the motion to amend should be decided by the arbitrator, not this Court, the Court does not agree. The motion to amend is tied to the gateway issue of arbitrability.

United States District Court

For the Northern District of California

1    As to prejudice, here as well Defendants' arguments are weak.  The proposed amendment

2   does not render Defendants' motions to compel arbitration nugatory.  Moreover, Defendants can still

3   argue, at the trial contemplated above, that Plaintiffs' prior judicial admission has evidentiary force

4   – *i.e.*, that the admission supports Plaintiffs having the mental capacity to contract and/or that

5   Plaintiffs were not unduly influenced to enter into the contracts.  *See Huey v. Honeywell, Inc.*, 82

6   F.3d 327, 333 (9th Cir. 1996) (noting that "admissions" made in a superseded pleading "are still

7   admissible evidence, though not conclusive, like any other extrajudicial admission made by a party

8   or its agent"); *see also Andrews v. Metro N. Commuter R. Co.*, 882 F.2d 705, 707 (2d Cir. 1989)

9   (holding that "[t]he amendment of a pleading does not make it any the less an admission of the

10   party").

11    Defendants' best contention is that Plaintiffs have made the amendment in bad faith, but

12   even here the Court is not persuaded that there is enough to deny Plaintiffs the ability to amend.  In

13   their motion to amend, Plaintiffs state:

> When researching the response to the motion to compel arbitration,
> Plaintiffs' counsel realized that no evidence of mutual consent actually
> existed.  Thus, in their oppositions to the motions to compel, Plaintiffs
> presented evidence of lack of mutual consent with either NNC or NFS.
> Believing that they could plead breach of contract in the alternative
> should the Court compel arbitration, Plaintiffs did not immediately
> seek leave to amend.  Given the concerns raised by the Court,
> Plaintiffs seek to eliminate any doubt as to their position that no
> contracts exist.

19   Docket No. 49 (Mot. at 3).

20    According to Defendants, it is implausible that Plaintiffs did not know, at the outset of this

21   case, that they lacked the mental capacity to contract or were unduly influenced to contract.  While

22   this argument is not without any force, Plaintiffs themselves are laypersons, not attorneys, and

23   therefore the Court cannot say that they even knew those defenses were potentially available to

24   them.  Plaintiffs, of course, are represented by attorneys who, presumably, should have known of the

25   defenses; apparently, they failed to explore the exact circumstances surrounding the signing of the

26   contracts, at least at or about the time the complaint was filed.  While an argument could be made

27   that competent counsel should have fully explored the circumstances earlier, there is no indication

28   that the failure to do so here was in bad faith.  The Court also notes it was not unreasonable for

United States District Court

For the Northern District of California

1   Plaintiffs to assert a claim for breach of contract to the extent the claim repeats or contains similar

2   allegations that representations were made to Plaintiffs about the Narconon program being

3   nonsecular in nature and having a high success rate.

4        To the extent Defendants argue that Plaintiffs are simply amending in order to avoid

5   arbitration, that may be true, but that fact is not damning in and of itself, particularly as there appears

6   to be an evidentiary basis for Plaintiffs' assertion that they lacked the mental capacity to contract

7   and/or were unduly influenced to contract.  *Cf. W. Run Stud. Hous. Assocs., LLC v. Huntington Nat'l*

8   *Bank*, 712 F.3d 165, 172 (7th Cir. 2013) (stating that dismissal was not "warranted because Plaintiffs

9   sought to 'take a contrary position . . . to avoid dismissal'[;] [p]laintiffs routinely amend complaints

10  to correct factual inadequacies in response to a motion to dismiss [–] even when the proposed

11  amendment flatly contradicts the initial allegation"); *St. Paul Fire & Mar. Ins. Co. v. Heath Fielding*

12  *Ins. Broking Ltd.*, No. 91 Civ. 0748 (MJL), 1995 U.S. Dist. LEXIS 19847, at *19-20 (S.D.N.Y. Jan.

13  17, 1996) (stating that "[a] party cannot be deemed to act in bad faith simply because it seeks to

14  avoid being bound by judicial admissions it no longer endorses").  Moreover, the Court cannot fault

15  Plaintiffs for not seeking to amend at the time they filed their oppositions to the motions to compel

16  because, as Plaintiffs point out, nothing barred them from having the breach-of-contract claim as an

17  alternative claim (*i.e.*, should the Court reject Plaintiffs' mental incapacity and undue influence

18  defenses to contract formation).

19        Finally, the Court notes that the situation in the case at bar is materially different from that in

20  *Hernandez v. DMSI Staffing, LLC*, No. C-14-1531 EMC, 2015 U.S. Dist. LEXIS 12824, at *10

21  (N.D. Cal. Feb. 3, 2015).  In *Hernandez*, there was far more evidence to substantiate the Court's

22  finding of bad faith, including, *e.g.*, the fact that the plaintiff had filed a duplicative state court action

23  in an attempt to "manipulate the risk of compelled arbitration."  *Id.* at *8.  Here, the evidence shows

24  at best that counsel should have done a better job of getting all relevant facts at the outset of the

25  case.

26        Accordingly, the Court hereby grants Plaintiffs' motion for leave to amend.  Plaintiffs shall

27  **IMMEDIATELY** file their amended complaint.  Because of the amendment, Defendants can no

28  longer argue ratification of the contracts (including the arbitration agreements) through a judicial

**United States District Court**
For the Northern District of California

1  admission.

2        2.        Ratification of Contract Through Conduct

3        To the extent there is also an argument that there was ratification of the contracts (containing

4  the arbitration provisions) as a result of Plaintiffs' conduct, Defendants fare no better.

5        First, it does not appear that Defendants argued ratification by conduct in their original

6  papers.  Second, even if they had, while there can be ratification through conduct, *see* Cal. Civ. Code

7  § 1588 (providing that "[a] contract which is voidable solely for want to due consent, may be ratified

8  by a subsequent consent"), that kind of ratification has limits.  For example, California Civil Code §

9  1589 provides: "A voluntary acceptance of the benefit of a transaction is equivalent to a consent to

10  all the obligations arising from it, *so far as the facts are known, or ought to be known*, to the person

11  accepting."  Cal. Civ. Code § 1589 (emphasis added); *see also Changzhou AMEC Eastern Tools &*

12  *Equip. CP., Ltd. v. Eastern Tools & Equip., Inc.*, No. EDCV 11-00354 VAP (DTBx), 2012 U.S.

13  Dist. LEXIS 106967, at *56 (C.D. Cal. July 30, 2012) (stating that "[t]he test for ratification is

14  'whether the releasor *with full knowledge of material facts entitling him to rescind* has engaged in

15  some unequivocal conduct giving rise to an inference that he intended his conduct to amount to a

16  ratification'"; adding that "'[w]hether the releasor has such knowledge . . . [is] normally [a]

17  question[] for the trier of fact'") (emphasis added); *Saret-Cook v. Gilbert, Kelly, Crowley & Jennett*,

18  74 Cal. App. 4th 1211, 1226 (1999) (noting that a party will be presumed to have waived the right to

19  rescind a contract if he has "'full knowledge of the circumstances which would warrant him

20  rescinding [but] nevertheless accepts and retains benefits accruing to him under the contract'"; for

21  example, "'[a]n affirmance of the contract at a time subsequent to the discovery of the falsity of the

22  representations inducing its execution [inducement of contract by false representations provides a

23  basis for rescission analogous to lack of capacity to contract] forecloses the exercise of the right of

24  rescission'").  Here, Plaintiffs fairly argue that, even if they accepted the benefits of the Narconon

25  facilities, they did not thereby know or have reason to know that the contracts with the facilities they

26  signed earlier while lacking capacity (as alleged) contained arbitration provisions and that those

27  contracts were subject to rescission. *See Dougherty v. Mieczkowski*, 661 F. Supp. 267, 275 (D. Del.

28  1987) (stating that "defendants cite no authority for the proposition that a person should know, by

United States District Court

For the Northern District of California

reason of having requested a broker to execute securities transactions, they will be bound by the broker's form contract mandating arbitration of all disputes[;] [b]asic contract principles require some objective evidence of assent, especially in the present context where an agreement to arbitrate forces a party to forego substantial rights"); *cf. Serafin v. Balco Properties Ltd., LLC*, 235 Cal. App. 4th 165, 176 (2015) (stating that "[e]vidence confirming the existence of an agreement to arbitrate, despite an unsigned agreement, can be based, for example, on 'conduct from which one could imply either ratification or implied acceptance *of such a provision*'") (emphasis added).  An analogy can be made here to waiver, which requires the intentional relinquishment of a known right after knowledge of the facts.  *See Hardisty v. Moore*, No. 11-cv-01591-BAS (BLM), 2015 U.S. Dist. LEXIS 22203, at *35 n.10 (S.D. Cal. Feb. 20, 2015) (stating that defendants failed to show that plaintiff ratified the contract and thereby waived his rights to claim damages for fraud).

    Because the Court rejects both ratification arguments, there shall be, as discussed above, a trial to resolve the issues of mental incapacity and undue influence.

D.    Unconscionability and Severability

    The Court acknowledges that Plaintiffs have raised an independent ground for denying Defendants' motions to compel arbitration – *i.e.*, that the arbitration provisions are unconscionable. However, the Court concludes that, even if some of the provisions were assumed to be unconscionable, Plaintiffs have failed to make an adequate showing of nonseverability.  Thus, arbitration would not be defeated because of unconscionability.

    Under California law, unconscionability has two components: procedural unconscionability and substantive unconscionability.  *See Armendariz v. Found. Health Psychcare Servs., Inc.*, 24 Cal. 4th 83, 114 (2000) (stating that both procedural and substantive unconscionability must be present "'in order for a court to exercise its discretion to refuse to enforce a contract or clause under the doctrine of unconscionability'").  "But they need not be present in the same degree. . . . [T]he more substantively oppressive  the contract term, the less evidence of procedural unconscionability is required to come to the conclusion that the term is unenforceable, and vice versa."  *Id.*

United States District Court

For the Northern District of California

1.      Procedural Unconscionability

For purposes of this opinion, the Court assumes arguendo that there is some level of procedural unconscionability in both Plaintiffs' cases.  Even if Plaintiffs had the mental capacity to contract and were not unduly influenced to contract, the same facts underlying Plaintiffs' claims of mental incapacity and undue influence may arguably support some level of procedural unconscionability.  Moreover, there is an argument that the contracts at issue were contracts of adhesion or akin to such contracts,[5] notwithstanding the fact that, in Mr. Landers's situation, his father was able to reduce the price of admission to some extent.  *See Abramson v. Juniper Networks, Inc.*, 115 Cal. App. 4th 638, 662 (2004) (stating that "[p]laintiff's ability to negotiate other aspects of his employment with Juniper has no bearing on whether he had the power to negotiate the arbitration provision").

2.      Substantive Unconscionability

As for substantive unconscionability, the Court assumes for the sake of argument that there are provisions that may be unconscionable.  First, however, the Court addresses Plaintiffs' contention that the arbitration agreements are generally unconscionable because of their scope.  Mr. Landers's admission agreement specified: "The parties agree that any controversy, dispute or claim arising out of or relating to or involving this Admission Agreement shall be resolved by binding arbitration."  Farnsworth Decl., Ex. 1 (Agreement at 12).  Similarly, Mr. Burgoon's admission agreements provided:

> The Parties agree that any controversy, dispute or claim arising out of, relating to or involving this Agreement; or any breach, termination, interpretation or disagreement concerning the validity of the Agreement; or the enrollment or participation of the Student in the [NNC] Program, including any claim for personal injuries or wrongful death, and any claim for refund that cannot be promptly settled by direct communication shall first be submitted for resolution by mediation through a mediator to be agreed upon by the Parties.

---

[5] *See Armendariz*, 24 Cal. 4th at 113 (stating that a contract of adhesion "'signifies a standardized contract, which, imposed and drafted by the party of superior bargaining strength, relegates to the subscribing party only the opportunity to adhere to the contract or reject it'"); *Gatton v. T-Mobile USA, Inc.*, 152 Cal. App. 4th 571, 585 (2007) ("hold[ing] that absent unusual circumstances, use of a contract of adhesion establishes a minimal degree of procedural unconscionability notwithstanding the availability of market alternatives").

Quaid Decl., Exs. A-B (Agreements at 8).  According to Plaintiffs, "[a] reasonable consumer would not expect claims unrelated to [the] admissions agreement to be included, such as the claims for false advertising asserted here, since those claims do not relate to the terms of the agreement or the client's experience at [the Narconon Center]."  Docket No. 30 (Opp'n at 12).

But contrary to Plaintiffs' naked assertion, Plaintiffs' misrepresentation claims are sufficiently related to the admission agreements.  Clearly, Defendants' advertising that the Narconon facilities are nonsecular and have high success rates is designed to induce a person to enter into an admissions agreement – which contains similar representations – and enroll in a facility.  Plaintiffs' reliance on *Lima v. Gateway, Inc.*, 886 F. Supp. 2d 1170 (C.D. Cal. 2012), and *Bruni v. Didion*, 160 Cal. App. 4th (2008), is unavailing as both cases are distinguishable.  In *Lima*, the arbitration provision was far broader, providing that the contracting parties "'agree that *any* Dispute between you and Gateway will be resolved exclusively and finally by arbitration,'" thus leading the court to state that "it is difficult to imagine *any* dispute between [the parties] that would lie outside its bounds."  *Lima*, 886 F. Supp. 2d at 1180.  In *Bruni*, the court put stock on the fact that "the arbitration provisions were not contained within the main purchase and sale agreement; instead, they were contained in what was labeled as a warranty," thus leading to the reasonable expectation that the provisions "would apply only to disputes over the Warranty."  *Bruni*, 160 Cal. App. 4th at 1294.

Beyond their general challenge above, Plaintiffs also contest three specific provisions as substantively unconscionable:  (1) the statute-of-limitation provision in Mr. Burgoon's contracts; (2) the confidentiality provision in Mr. Landers's contract; and (3) the cost-splitting provisions in both Plaintiffs' contracts.[6]

---

[6] The Court notes that, in their papers, Plaintiffs have referenced the cost of arbitrating in a forum that is not their hometown.  Plaintiffs, however, have not directly raised an argument that the forum selection clauses in the admission agreements are substantively unconscionable.  Because Plaintiffs have not directly raised the argument, the Court does not make any ruling on it.  The Court notes, however, that there appears to be a significant weakness with such an argument.

For Mr. Landers (a resident of Forksville, Pennsylvania), the contract provided that the forum would be Los Angeles County and, for Mr. Burgoon (a resident of Arcata, California), the contracts provided that the forum would be Santa Cruz County.  *See* Farnsworth Decl., Ex. 1 (Agreement at 12); Quaid Decl., Exs. A-B (Agreements at 9).  Both fora are close to or are where the NFS and NNC facilities are located where Plaintiffs sought treatment (San Diego County and Santa Cruz County, respectively).  Thus, it would be difficult to say that the selection of the forum was one-sided or unreasonable.  *See Bolter v. Superior Court*, 87 Cal. App. 4th 900, 910 (2001)

United States District Court

For the Northern District of California

Even assuming (without deciding) Plaintiffs' claims of substantive unconscionability have merit, that would not defeat arbitration in toto unless the provisions are not severable. Under California law, whether severance is appropriate largely turns on whether the "the central purpose of the contract is tainted with illegality," in which case "the contract as a whole cannot be enforced." *Armendariz*, 24 Cal. 4th at 124. In contrast, if the unconscionability "is collateral to the main purpose of the contract," then severance is generally proper. *Id.*; *see also Serafin v. Balco Props. Ltd., LLC*, 235 Cal. App. 4th 165, 183-84 (2015) (stating that "a court should sever an unconscionable provision unless the agreement is so 'permeated' by unconscionability that it cannot be cured by severance.")[7] In *Armendariz*, the California Supreme Court concluded that,

> two factors weigh against severance of the unlawful provisions. First, the arbitration agreement contains more than one unlawful provision; it has both an unlawful damages provision and an unconscionably unilateral arbitration clause. Such multiple defects indicate a systematic effort to impose arbitration on an employee not simply as an alternative to litigation, but as an inferior forum that works to the employer's advantage. In other words, given the multiple unlawful provisions, the trial court did not abuse its discretion in concluding that the arbitration agreement is permeated by an unlawful purpose.
>
> Second, in the case of the agreement's lack of mutuality, such permeation is indicated by the fact that there is no single provision a court can strike or restrict in order to remove the unconscionable taint from the agreement. Rather, the court would have to, in effect, reform the contract, not through severance or restriction, but by augmenting it with additional terms. Civil Code section 1670.5 does not authorize such reformation by augmentation, nor does the arbitration statute. Code of Civil Procedure section 1281.2 authorizes the court to refuse arbitration if grounds for revocation exist, not to reform the agreement to make it lawful. Nor do courts have any such power under their inherent limited authority to reform contracts. Because a court is

_____

(stating that company's "prohibition against consolidation, limitation on damages and forum selection provisions have no justification other than as a means of maximizing an advantage over the petitioners"); *see also Am. Online v. Superior Court*, 90 Cal. App. 4th 1, 12 (2001) (stating that "[o]ur law favors forum selection agreements only so long as they are procured freely and voluntarily, with the place chosen having some logical nexus to one of the parties or the dispute, and so long as California consumers will not find their substantial legal rights significantly impaired by their enforcement").

[7] *See* Quaid Decl., Exs. A-B (Agreements at 9) (providing that, "[i]f any provision of this Agreement is held by a court or arbitrator to be either invalid, void or unenforceable, the remaining provisions of this Agreement shall remain in full force and effect unimpaired by the holding"); *see also* Cal. Civ. Code § 1670.5(a) ("If the court as a matter of law finds the contract or any clause of the contract to have been unconscionable at the time it was made the court may refuse to enforce the contract, or it may enforce the remainder of the contract without the unconscionable clause, or it may so limit the application of any unconscionable clause as to avoid any unconscionable result.").

United States District Court

For the Northern District of California

1      unable to cure this unconscionability through severance or restriction
and is not permitted to cure it through reformation and augmentation,
2      it must void the entire agreement.

3  *Id.* at 124-25; *see also Stacy v. Brinker Rest. Corp.*, No. 1:12-cv-00851-LJO-BAM,  2012 U.S. Dist.

4  LEXIS 150345, at *29 (E.D. Cal. Oct. 18, 2012) (report and recommendation) (noting that "[a] high

5  frequency of unconscionable clauses not only indicates an attempt to systematically disadvantage an

6  employee, but it also makes it more likely that severance would force the court to rewrite the

7  contract"), *adopted by* 2012 U.S. Dist. LEXIS 162250 (E.D. Cal. Nov. 13, 2012).

8        In Mr. Landers's case, there are two allegedly unconscionable provisions, namely, the cost-

9  splitting provision and the confidentiality provision.  In Mr. Burgoon's case, there are likewise two

10  allegedly unconscionable provisions, more specifically, the cost-splitting provision and the statute-

11  of-limitations provision.  While the *Armendariz* Court found that the two unconscionable provisions

12  before it were enough to "indicate a systematic effort to impose arbitration on an employee not

13  simply as an alternative to litigation, but as an inferior forum that works to the employer's

14  advantage," *id.* at 124, the Court did not hold that any time there is more than one unconscionable

15  provision, severance is not possible.  Indeed, there are cases in which courts have severed as many

16  as three provisions.  *See, e.g.*, *Grabowski v. C.H. Robinson Co.*, 817 F. Supp. 2d 1159, 1179 (S.D.

17  Cal. 2011) (severing three unconscionable provisions – "the 'carve out' provision stating that the

18  Dispute Resolution Agreement does not apply to 'any claims by the Company that includes a request

19  for injunctive or equitable relief'; the confidentiality provision; and the attorney's fees provision");

20  *Pope v. Sonatype, Inc.*, No. 5:15-cv-00956-RMW, 2015 U.S. Dist. LEXIS 60815, at *16-17 (N.D.

21  Cal. May 8, 2015) (also severing three unconscionable provisions – "(1) [the] trade secret

22  misappropriation injunctive relief carve-out, (2) the requirement that arbitration take place in

23  Washington, D.C., and (3) the requirement that Pope pay attorney's fees unless he is a prevailing

24  party").

25        Because the exact number of unconscionable provisions is not dispositive, the Court must

26  focus instead, as indicated above, on whether "the central purpose of the contract is tainted with

27  illegality."  *Armendariz*, 24 Cal. 4th at 124.  Here, the Court cannot say that the "taint" from the

28  cost-splitting and confidentiality provisions in Mr. Landers's case and the cost-splitting and statute-

United States District Court

For the Northern District of California

1  of-limitations provisions in Mr. Burgoon's case permeated the arbitration agreements to such an

2  extent that the purpose of the agreements – *i.e.*, to arbitrate rather than litigate – was transformed –

3  *i.e.*, to impose arbitration "not simply as an alternative to litigation, but as an inferior forum." *Id.*

4  *Compare, e.g.*,  *Lucas v. Gund, Inc.*, 450 F.Supp.2d 1125, 1134 (C.D. Cal. 2006) (noting that, aside

5  from costs and fees provision and forum selection clause, "nothing else in the agreement is patently

6  unfair to the employee, and nothing suggests that the agreement was drafted with the purpose of

7  depriving employees of the right to litigate their claims""), *with Zaborowski v. MHN Gov't Servs.*,

8  936 F. Supp. 2d 1145, 1157 (N.D. Cal. 2013) (finding that the arbitration agreement was permeated

9  with unconscionability as a result of "provisions rang[ing] from the method of selecting the

10  arbitrator, the shortened statute of limitations, and limits on statutory remedies, to the filing fees and

11  the allocation of fees and costs").  In this regard, it is worth noting that the cost provisions – even if

12  found to be substantively unconscionable – were not clearly designed to create an inferior forum

13  (that is to say, an inaccessible forum).  This is because the case at bar is unlike the typical consumer

14  case where the cost of arbitration dwarfs the cost of the product or services at issue.  Here, the

15  services sought by Plaintiffs were significant in terms of cost.

16       The Court's conclusion above is buttressed by the fact that it is possible to sever the

17  unconscionable provisions, without any need for the Court to reform the contracts by augmenting

18  them with additional terms.  The confidentiality provision in Mr. Landers's case and the statute-of-

19  limitations provision in Mr. Burgoon's case, as well as the cost-splitting provisions in both

20  Plaintiffs' cases, can all be cleanly excised.  *Compare Circuit City Stores, Inc. v. Mantor*, 335 F.3d

21  1101, 1109 (9th Cir. 2003) ("Because 'any earnest attempt to ameliorate the unconscionable aspects

22  of Circuit City's arbitration agreement would require this court to assume the role of contract author

23  rather than interpreter, we hold that this agreement is unenforceable in its entirety.").

24       Accordingly, Plaintiffs' contention that there is an independent ground to avoid arbitration –

25  *i.e.*, unconscionability – lacks merit because any unconscionability is capable of being severed.

26  E.    Nonsignatories to Arbitration Agreement

27       The Court's analysis above concerns potential arbitration between Plaintiffs and NFS and

28  NNC only, and not the "higher-up" Narconon companies (*i.e.*, Western, International, and ABLE).

20

**United States District Court**
For the Northern District of California

1  This is because only NFS and NNC were signatories to the admission agreements.  There is no

2  dispute that Western, International, and ABLE are nonsignatories.  Nevertheless, the higher-up

3  Narconon companies contend in their papers that they are equally entitled to arbitration (that is,

4  assuming the cases will be arbitrated based on the admission agreements with NFS and NNC).

5      Mr. Landers concedes that the higher-up Narconon companies may seek the benefit of

6  arbitration because, if he had the mental capacity to contract and was not unduly influenced to

7  contract, then the admission agreement specifies that it "applies to disputes, controversies or claims

8  involving not only [NFS] but any related entities, licensors, the members of the Board of Directors,

9  the officers and the staff."  Farnsworth Decl., Ex. 1 (Agreement at 12).  Mr. Burgoon's contracts,

10  however, do not contain a comparable provision and thus he contests the right of the higher-up

11  Narconon companies to seek arbitration.

12      In their papers, the higher-up Narconon companies invoked only an equitable estoppel

13  doctrine as a basis to compel Mr. Burgoon to arbitration.  *See* Docket No. 27 (Mot. at 8).  Thus, even

14  though the parties have now submitted supplemental briefing (as ordered by the Court) as to whether

15  an agency theory may also be applicable, the Court now declines to address the merits of that theory.

16  The higher-up Narconon companies could have raised an agency theory in their opening brief but

17  failed to do so, and thereby have waived the argument.[8]

18      Under California law, equitable estoppel allows a nonsignatory to arbitration agreement to

19  compel a signatory to that agreement to arbitration in two circumstances:

20      (1) when a signatory must rely on the terms of the written agreement
        in asserting its claims against the nonsignatory or the claims are
21      "intimately founded in and intertwined with" the underlying contract,
        and (2) when the signatory alleges substantially interdependent and
22      concerted misconduct by the nonsignatory and another signatory and

23  _____

[8] And, in any event, no evidence was ever presented to the Court that NNC had actual or
24  apparent authority to sign on the higher-up Narconon companies' behalf.  *See OSU Pathology
    Servs., LLC v. Aetna Health, Inc.*, No. 2:11-cv-005, 2011 U.S. Dist. LEXIS 47895, at *36-37 (S.D.
25  Ohio May 4, 2011) (stating that "a nonsignatory principal can be compelled to arbitrate under an
    agency theory if a party to the contract signed the contract containing the arbitration agreement as
26  the nonsignatory's agent[;] [u]nder ordinary agency principles, a principal is bound by contracts
    executed by an agent with actual or apparent authority"); *see also Mance v. Mercedes-Benz USA*,
27  901 F. Supp. 2d 1147, 1156 n.6 (N.D. Cal. 2012) (Beeler, J.) (noting that "[p]erhaps a principal can
    assert its agent's contractual arbitration remedy, but Mercedes-Benz does not make that argument
28  sufficiently" and "Mercedes-Benz has not put forth evidence to demonstrate that Dealer even was its
    agent (instead stating that 'of course' it was)").

United States District Court

For the Northern District of California

1
2
> "the allegations of interdependent misconduct [are] founded in or intimately connected with the obligations of the underlying agreement."

3 *Kramer v. Toyota Motor Corp.*, 705 F.3d 1122, 1128-29 (9th Cir. 2013).  Both prongs reflect the

4 core concept of equitable estoppel: to prevent "a party from claiming the benefits of a contract while

5 simultaneously attempting to avoid the burdens that contract imposes."  *Murphy v. DirecTV, Inc.*,

6 724 F.3d 1218, 1229 (9th Cir. 2013).

7 Now that Plaintiffs have dropped their breach-of-contract claim, the Court need only

8 evaluate whether Mr. Burgoon's statutory and tort claims "are dependent on or inextricably bound

9 up with the contractual obligations of the agreement containing the arbitration clause."  *Goldman v.*

10 *KPMG LLP*, 173 Cal. App. 4th 209, 213-14 (2009).

11 A claim is not bound up with a contract when a plaintiff's claims do not depend on the

12 agreement's terms.  For example, in *Murphy v. DirecTV, Inc.*, 724 F.3d 1218 (9th Cir. 2013),

13 the plaintiffs sued Best Buy for making misrepresentations to customers at the point of sale that they

14 were actually buying, rather than just leasing, certain DirecTV service equipment (*e.g.*, receivers and

15 digital video recorders).  Best Buy did not have any agreement with the plaintiffs containing an

16 arbitration clause, but there was an arbitration clause in the customer agreements that plaintiffs had

17 with DirecTV.  Best Buy, as a nonsignatory to the customer agreements, tried to compel the

18 plaintiff-signatories to arbitration on the basis of equitable estoppel. The Ninth Circuit rejected Best

19 Buy's contention that the plaintiffs' fraud claims relied on or were intertwined with the DirecTV

20 customer agreements.

21
22
23
24
25
26
27
28
> Even if Best Buy is correct that Plaintiffs' [fraud] claims on some abstract level require the existence of the Customer Agreement, the law is clear that this is not enough for equitable estoppel.  In California, equitable estoppel is inapplicable where a plaintiff's "allegations reveal no claim of any violation of any duty, obligation, term or condition imposed by the [customer] agreements."  Applying this principle in *Kramer*, we held that Toyota could not compel arbitration of a consumer class action on the basis of arbitration clauses contained in the Purchase Agreements customers entered into with their dealerships.  We expressly rejected Toyota's argument that the plaintiffs' claims were necessarily intertwined with the Purchase Agreements merely because the lawsuit was predicated on the bare fact that a vehicle purchase occurred.  Rather, we held that the plaintiffs' causes of action, which, as here, largely arose under California consumer protection law, were not sufficiently intertwined

United States District Court

For the Northern District of California

1
2
3
with the Purchase Agreements to trigger equitable estoppel.  Likewise, here, the Customer Agreement proves at most the existence of a transaction; Plaintiffs' claims do not depend on the Agreement's terms.

4   *Id.* at 1230-31; *see also Kramer*, 705 F.3d at 1129 (stating that "'[m]erely 'mak[ing] reference to' an

5   agreement with an arbitration clause is not enough"); *In re Carrier IQ, Inc. Consumer Priv. Litig.*,

6   No. C-12-md-2330 EMC, 2014 U.S. Dist. LEXIS 42624 (N.D. Cal. Mar. 28, 2014) (stating that

7   "[t]he fact that the installation of the CIQ software [which allegedly violated the plaintiffs' privacy

8   rights] might not have occurred absent a service agreement between the wireless carriers and

9   Plaintiffs does not satisfy the test of reliance or intertwining"); *In re Apple Iphone 3G Prods. Liab.*

10   *Litig.*, 859 F. Supp. 2d 1084, 1095 (N.D. Cal. 2012) (indicating that a "but-for" connection between

11   the agreement and the challenged conduct is not enough).  Moreover, the Ninth Circuit underscored

12   that "equitable estoppel is particularly inappropriate where plaintiffs seek the protection of consumer

13   protection laws against misconduct that is unrelated to any contract except to the extent that a

14   customer service agreement is an artifact of the consumer-provider relationship itself."  *Murphy*, 724

15   F.3d at 1231 n.7.

16       As in *Murphy*, the statutory and tort claims asserted by Mr. Burgoon in the instant case do

17   not depend on the obligations (or even the existence) of the contract.  Because of this, there is no

18   inequity to remedy.  *See Goldman*, 173 Cal. App. 4th at 213-14 ("[T]he lynchpin for equitable

19   estoppel is equity, and the point of applying it to compel arbitration is to prevent a situation that

20   would fly in the face of fairness.") (internal quotation marks omitted).  This is particularly evident

21   because the alleged misconduct (misrepresentations about the Narconon program being secular in

22   nature and having a high success rate) occurred before the contracts were signed.  Since it would not

23   create an unfair situation, the Court concludes that the doctrine of equitable estoppel should not

24   apply and, accordingly, Western, International, and ABLE cannot – as nonsignatories to the

25   arbitration agreements – compel arbitration.

26   F.    <u>Stay</u>

27       This leaves the Court with somewhat of a predicament: NFS and NNC may be able to

28   arbitrate, and the higher-up Narconon companies may also be able to arbitrate to the extent the

United States District Court

For the Northern District of California

1  claims are related to NFS (Mr. Landers).  The higher-up Narconon companies, however, cannot

2  arbitrate with respect to the claims related to NNC (Mr. Burgoon) – even if NNC is ultimately able

3  to arbitrate – because there is no contract provision authorizing such and equitable estoppel is not

4  available.

5       Although the higher-up Narconon companies cannot arbitrate with respect to the claims

6  related to NNC (Mr. Burgoon) and must litigate such claims in court, the Court finds that it makes

7  sense to temporarily stay proceeding on these claims, at least until the trial on the mental incapacity

8  and undue influence issues is resolved.  The Court, however, hereby issues a preservation order –

9  applicable to all Defendants – to ensure that all relevant information will not, inadvertently or not,

10 be destroyed.  This ruling does not bar Plaintiffs from asking for leave to take third-party discovery,

11 if necessary, as the preservation order does not extend to third parties.  Moreover, this ruling does

12 not bar the Court from lifting the stay should the trial on mental incapacity and undue influence be

13 delayed.  Finally, this ruling shall not dictate whether or not the Court would continue a stay if in

14 fact arbitration would proceed against NFS and NNC (and the Narconon companies to the extent the

15 claims are related to NFS).

16      As for the pending motion to dismiss filed by, *inter alia*, the higher-up Narconon companies,

17 the Court notes that said motion is not a bar to any possible third-party discovery, especially as there

18 is nothing to show that any deficiency in Plaintiffs' complaint would be incapable of being cured

19 through amendment.  *Cf. Gray v. First Winthrop Corp.*, 133 F.R.D. 39, 40 (N.D. Cal. 1990) ("Had

20 the Federal Rules contemplated that a motion to dismiss under Fed. R. Civ. Pro. 12(b)(6) would stay

21 discovery, the Rules would contain a provision to that effect.").

22 ///

23 ///

24 ///

25 ///

26 ///

27 ///

28 ///

**III.   CONCLUSION**

For the foregoing reasons, the Court grants Plaintiffs' motion for leave to amend, defers ruling on the motions to compel arbitration, and defers ruling on the motions to dismiss.  As discussed above, within two weeks of the date of this order, the parties shall meet and confer, consult with Courtroom Deputy Betty Lee regarding available trial dates, and file a joint proposed trial plan to adjudicate the issues of mental incapacity and undue influence.

This order disposes of Docket No. 49.

IT IS SO ORDERED.

Dated:  August 27, 2015

_____
EDWARD M. CHEN
United States District Judge